## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| H.B. FULLER COMPANY, *a Minnesota corporation* | Civil No. 09-2827(JRT/JJG) |

Plaintiff,

v.

UNITED STATES FIRE INSURACE
COMPANY, *a Delaware corporation*; and
INTERNATIONAL INSURANCE
COMPANY, *a California corporation n/k/a*
TIG INSURANCE COMPANY,

Defendants.

―――――――――――――――――――――

UNITED STATES FIRE INSURANCE
COMPANY, *a Delaware corporation*,

Third-Party Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, *as
successor to* NORTHBROOK
INSURANCE COMPANY, *an Illinois
corporation*, FIRST STATE INSURANCE
COMPANY, *a Connecticut corporation*,
and NATIONAL UNION INSURANCE
COMPANY OF PITTSBURGH,
PENNSYLVANIA, *a Pennsylvania
corporation*,

Third-Party Defendants.

**MEMORANDUM OPINION
AND ORDER**

---

Lauren E. Lonergan, Molly B. Thornton, Paul J. Hemming, Samuel L. Hanson, and Susan E. Gelinske, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for plaintiff.

James T. Martin, **GISLASON MARTIN VARPNESS & JANES, PA**, 7600 Parklawn Avenue South, Suite 444, Edina, MN 55435; Leslie A. Davis and Paul W. Kalish, **CROWELL & MORING LLP**, 1001 Pennsylvania Avenue North-West, Washington, DC 20004, for defendant/third-party plaintiff United States Fire Insurance Company.

Janine M. Loetscher and John M. Anderson, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for defendant International Insurance Company.

Catherine A. Estrada and Randall J. Peters, **LYNBERG & WATKINS**, 888 South Figueroa Street, Sixteenth Floor, Los Angeles, CA 90017; and Timothy P. Tobin, **GISLASON & HUNTER LLP**, 701 Xenia Avenue South, Suite 500, Minneapolis, MN 55416, for third-party defendant National Union Insurance Company of Pittsburgh, Pennsylvania.

Adam K. Snyder, Daniel A. Waitzman, and Robert R. Anderson, III, **HUGHES, SOCOL, PIERS, RESNICK & DYM, LTD**, 70 West Madison Street, Suite 4000, Chicago, IL 60602; and Peter G. Van Bergen, **COUSINEAU MCGUIRE CHARTERED**, 1550 Utica Avenue South, Suite 600, Minneapolis, MN 55416-5318, for third-party defendant Allstate Insurance Company.

Robert L. McCollum, **MCCOLLUM CROWLEY MOSCHET, MILLER & LAAK, LTD**, 7900 Xerxes Avenue South, Suite 700, Minneapolis, MN 55431; and Stacy S. Freel and Wayne S. Karbal, **KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC**, 150 South Wacker Drive, Suite 1700, Chicago, IL 60606, for third-party defendant First State Insurance Company.

Plaintiff H.B. Fuller Company ("Fuller") brought this case against four insurance carriers, United States Fire Insurance Company ("US Fire"), First State Insurance Company ("First State"), Allstate Insurance Company as successor in interest to Northbrook Insurance Company, and International Insurance Company ("Allstate") (jointly, "Carriers" or "defendants"), seeking declaratory judgments against the Carriers regarding coverage for asbestos claims. Both parties moved for partial summary judgment on the allocation of liability for the time period covered by other insurers all of whom are now insolvent. Because insurance coverage was available during the relevant time period, the Court grants the Carriers' motion for partial summary judgment, and

denies Fuller's motion for partial summary judgment.  The Court also declines to certify a question to the Minnesota Supreme Court.

## BACKGROUND

### I.   PARTIES

Fuller is a manufacturer of specialty adhesives and other chemical products, headquartered in St. Paul, Minnesota.  It acquired the product line at issue in this litigation through an asset purchase in 1976.  Fuller is presently defending claims in multiple jurisdictions alleging injury caused by exposure to asbestos-containing products over long periods of time.  Fuller purchased liability coverage for the time between when it acquired the product line in 1976 and 1985, when Fuller claims asbestos insurance coverage ceased being available.  The policies are "occurrence" based policies, and each policy providing liability coverage from December 1, 1985 onward contains "asbestos exclusions" preventing coverage for asbestos claims from that date forward  (*See generally* Lauren E. Lonergan Aff. Exs. A-R, Feb. 3, 2011, Docket No. 81.)

The Carriers' policies are all "umbrella" or "second layer" policies that are only triggered if underlying "first dollar" policies' limits have been met.[1]  The insurance policies covering the time between November 30, 1980, and December 1, 1984[2] were issued by companies that are now insolvent, as determined by the insurance

---

[1] The parties do not dispute that the underlying limits have been met triggering coverage for the policy periods.

[2] None of the defendants in this case provided any level of insurance between 1980 and 1984.

commissioners of the home states of each carrier.  (Paul J. Hemming Aff. Exs. A-C, E-G, I-J, L-M, Feb. 3, 2011, Docket No. 82.)   The declarations from the insurance commissioners triggered the commencement of state court insolvency proceedings.   In each case, the presiding courts ordered that to qualify to receive a distribution from the insolvency estate based on claims covered by the insolvent carrier's policies, insureds had to establish a fixed liability for each such claim by a certain date, known as the "bar date."  (*Id.* ¶¶ 3-6.)  The bar date for all carriers has now passed.  (*Id.*)

Fuller first filed suit against US Fire on October 13, 2009.   (Compl., Docket No. 1.)  On February 26, 2010, US Fire filed a third-party complaint against First State and Allstate.  (Docket No. 11.)  Later that year, Fuller amended its complaint, adding International as a party.  (Docket No. 61.)  The parties have also filed various cross- and counter-claims against each other.

## II.   POLICIES

The Carriers' policies were in effect for specific periods between 1976 and 1980. (*See* Lonergan Aff. Exs. A-R.)  During that time Fuller's premiums increased.  In 1976, Fuller purchased primary and first-layer excess policies with a face value of $15.3 million in coverage for approximately $52,000 in premiums.  (*Id.* Exs. A, B.)  In 1977, Fuller paid a total of $192,000 in premiums for primary and first-layer excess policies with a face-value of $5.5 million.  (*Id.* Exs. A, C, D.)  After 1980, Fuller stopped purchasing first-layer excess coverage from any of the Carriers, and purchased more coverage for lower premiums from five other insurance providers.  For instance, in 1981, Fuller paid approximately $208,000 in premiums for primary and first-layer excess policies with a

face value of $26 million.  (*Id.* Exs. K, L.)  Between 1982 and 1984, Fuller paid between

$120,000 and $162,000 in premiums for primary and first-layer excess coverage with

face values ranging from $6 million to $16 million per year.  (*Id.* Exs. M-N, Q-R.)

The Carriers' policies included various provisions limiting coverage only to

injuries or damage occurring during the policy period.  For instance:

> The term "Occurrence" shall mean an accident or a happening or event or a
> continuous or repeated exposure to conditions which unexpectedly and
> unintentionally results in personal injury, property damage . . . **during the
> policy period**.

> This policy applies to occurrences happening anywhere **during the policy
> period** . . . "occurrence" means either an accident or a happening or event
> or a continuous or repeated exposure to conditions which unexpectedly and
> unintentionally causes injury . . . during the policy period . . . .

> This policy applies to occurrences happening any time **during the policy
> period**.

(Lonergan Aff. Exs. B (Allstate policy no. 63000550), H-J (US Fire policy no.

52035983783), U (International policy no. 5231987172) (emphasis added).)

Fuller asks the Court to determine that no liability or costs be allocated to it for the

time period where it purchased coverage from now insolvent insurers (1980-1984) and

seeks a threshold declaration that allocation of funding for any settlements or judgments

related to asbestos claims should exclude the four policy years with insolvent carriers.

The Carriers' motion asks the Court to determine that insurance was available in the

marketplace at all relevant times, thus liability should be allocated among the insurers

and Fuller.  Both parties have characterized resolution of this motion as necessary for

moving forward with ongoing settlement discussions.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.    *WOODDALE* AND ALLOCATION

At the heart of these motions is how the Minnesota Supreme Court allocates liability when an insured lacks coverage during an event or occurrence.  Fuller contends that the Minnesota Supreme Court's decision in *Wooddale Builders, Inc. v. Maryland Casualty Co.*, 722 N.W.2d 283 (Minn. 2006), requires that when insurance is not "available" to an insured for certain claims (i.e. continuing harms such as asbestos injuries) the liability and costs for that harm should be allocated among the other insurers who are liable for the same harm, not the insured.  The Carriers' position is that the Minnesota Supreme Court, as well as courts in other states, require the insured to be responsible for uninsured periods, and that *Wooddale* carved out a narrow exception whereby costs and liability will **not** be allocated to an insured **only** when coverage is

literally unavailable in the marketplace.  The issue is thus primarily about the meaning of "availability."  Because the issues in these motions require analysis of Minnesota law and comparison to the law of other states, the Court first evaluates Minnesota law on pro rata time on the risk allocation and liability, then discusses how other states and the Eighth Circuit have approached insurer insolvency, and then applies the analysis to the allocation at issue here.

### A.    "Pro Rata Time on the Risk" and Availability

Minnesota courts apply the "pro rata time on the risk" or "pro rata to the insured" allocation scheme in cases with claims for an "actual injury."  "The essence of the actual injury trigger theory is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period.  Where the policy periods do not overlap, therefore, the insurers are **consecutively**, not **concurrently** liable."  *N. States Power Co. v. Fidelity and Cas. Co. of N.Y.*, 523 N.W.2d 657, 662 (Minn. 1994) [hereinafter *NSP*] (emphasis original).  However, where more than one insurer is involved over multiple periods of time, a question arises as to how to allocate damages consistent with the "actual injury" trigger theory.  When damages are continuous and indivisible, they will be allocated across policy years.  *NSP*, 523 N.W.2d at 663-64.  "[W]hen allocating risk among insurers and when allocating risk between insurers and insured under the pro-rata-by-time-on-the-risk method, [courts] allocate the **total damages** for which the insured is legally responsible."  *Wooddale*, 723 N.W.2d at 299 (emphasis added).

Several allocation approaches are used by courts: the first is to apportion the damages as proven. A second theory is to allocate damages by each insurer's "time on the risk." *NSP*, 523 N.W.2d at 663. The Supreme Court noted that the advantage of the first theory "is that it is completely consistent with [comprehensive general liability] policy language limiting liability to damages incurred 'during the policy period.'" *Id.* However, with continuing harms, such as asbestos injury, "this option is unattractive given the scientific complexity of the issues involved, the extended period of time over which damages may have occurred before discovery, and the number of parties potentially involved." *Id.*

Thus the second approach

assumes that the damages in a contamination case are evenly distributed (or continuous) through each policy period from the first point at which damages occurred to the time of discovery, cleanup or whenever the last triggered policy period ended. Each triggered policy therefore bears a share of the total damages proportionate to the number of years it was on the risk relative to the total number of years of coverage triggered.

*Id.*; *St. Paul Fire and Marine Ins. Co. v. A.P.I., Inc.*, 738 N.W.2d 401, 410 (Minn. Ct. App. 2007) (applying the allocation approach to asbestos bodily injury claims). For example, if the

contamination occurred over a period of 10 years, 1/10th of the damage would be allocable to the period of time that a policy in force for 1 year was on the risk and 3/10ths of the damage would be allocable to the period of time a 3-year policy was in force.

*NSP*, 523 N.W.2d at 664. Another case dealing with the "time on the risk" approach, *Domtar, Inc. v. Niagara Fire Insurance Co.*, 563 N.W.2d 724 (Minn. 1997), refined the analysis in *NSP* to address situations in which an insured did not have insurance for some

period of time.  *See also Jostens, Inc. v. CNA Ins./Cont'l Cas. Co.*, 403 N.W.2d 625, 630 (Minn. 1987) (holding that if a claim involves injuries during the policy period **and** during a period when the policyholder is uninsured, damages attributable to the uninsured years are the policyholder's responsibility, not another insurer's) *overruled on other grounds by NSP*, 523 N.W.2d at 664.  In *Domtar*, the insured, a coal-tar processor, sued several of its liability insurers seeking declaration of coverage for costs of cleaning environmental contamination.  *Domtar*, 563 N.W.2d at 725.  The court determined that when damage is part of a continuous process, it is appropriate to include in the allocation years in which damage occurred but the insured did not prove the existence of coverage, and to allocate the damages during those uninsured years to the insured.  *Id.* at 733 n.5 (citing *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1203-04 (2d Cir. 1995) and *Comm. Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir. 1990)).

In *Wooddale*, the Minnesota Supreme Court held that time on the risk allocations include periods during which the insured was "**voluntarily** self-insured."  722 N.W.2d at 298 (emphasis added).  The court stated:

> Allocating damages to the insured for periods during which it elected to be self-insured, but not allocating damages for periods during which water intrusion coverage **was not available to the insured**, results in holding the insured responsible for only those risks that it elected to assume. . . .  We therefore conclude that the total period over which liability is allocated must include any times during which damages occurred but Wooddale was **voluntarily self-insured**.

*Id.* at 297-98 (emphasis added).  The *Wooddale* court remanded the case to determine whether Wooddale was uninsured by choice or whether insurance was unavailable in the market.  *Id.* at 301.

A later, unpublished case from the Minnesota Court of Appeals found that the issue in *Wooddale* was "not whether the policies actually provided coverage based on the specific facts of the claim but, rather, whether the coverage for the particular risk was **generally available in the marketplace**."  *St. Paul Mercury Ins. Co. v. N. States Power Co.*, No. A07-1775, 2009 WL 2596074, at *8 (Minn. Ct. App. Aug. 25, 2009) (emphasis added).  The rule set forth in *Wooddale* can be summarized as follows: if insurance coverage is "available" during a particular period, and an insured "voluntarily" self-insures, it is appropriate to allocate liability to the insured in the event of a claim for harm of a continuous nature.  The rule, however, does not specifically address the situation in this case, where insolvency is also a factor.

### B.    Insolvency

Several other courts have directly addressed the issue of insolvency and insurance coverage, which are at issue in this case.  In *Stonewall*, the Second Circuit adopted a proration to the insured allocation scheme because it "oblige[s] a manufacturer to accept a proportionate share of a risk that it elected to assume, either by declining to purchase available insurance or by purchasing what turned out to be an insufficient amount of insurance."  73 F.3d at 1204.  The court required the insured to pay for those years in which coverage was available in the market but it was uninsured, either because it purchased no insurance or its policy limits were exhausted.  *Id.*

Similarly, the Supreme Court of New Jersey held that pursuant to the insured allocation scheme:

> [I]nsurers are allocated losses based on their undertakings, the insured is required to pay its "aliquot" share of both defense and indemnification on account of years in which it is uninsured or self-insured, and **the insured also is responsible for years in which coverage is exhausted or its insurer bankrupt**. . . . Policyholders who chose to "go bare" or underinsure must sustain the burden of those choices. Likewise, **policyholders are required to underwrite the risk of insurer insolvency or bankruptcy.**

*Benjamin Moore & Co. v. Aetna Cas. & Surety Co.*, 843 A.2d 1094, 1102-03 (N.J. 2004); *Owens-Illinois v. United Ins. Co.*, 650 A.2d 974, 993 (N.J. 1994) ("When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable.").  A New York court reached a similar conclusion on the issue of risk allocation, finding that insurers

> should not be forced to pick up coverage for periods where [the insureds choose] to obtain an insurance policy with an insurance company that became defunct through no fault of [the insurers], and [the insurers] should not be forced to become a guarantor for the insolvent insurance company.

*Cont'l Cas. Co. v. Emp'rs Ins. Co. of Wausau*, 865 N.Y.S.2d 855, 864 (N.Y. Sup. Ct. 2008) (internal citations omitted).  Further, the Appellate Court of Illinois held that "[t]he risk of an insurance carrier becoming insolvent is placed on the insured rather than on another carrier that was a stranger to the selection process." *AAA Disposal Sys., Inc. v. Aetna Cas. & Surety Co.*, 821 N.E.2d 1278, 1290 (Ill. App. Ct. 2005) (citing *Sybron Transition Corp. v. Sec. Ins. of Hartford,* 258 F.3d 595, 598 (7th Cir. 2001)).  "The insolvency of a successor excess carrier should not increase the liability of its

predecessor." *Id.* (holding that the trial court erred by excluding the insolvent period from the pro rata allocation).

Further, "[a]llocation results in the insured bearing the risk of any of its insurers' inability to pay, instead.  There is logic in having the risk of such defalcation fall on the insured, which purchased the defaulting insurer's policy, rather than on another insurer which was a stranger to the selection process." *Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 323 (2d Cir. 2000).

In contrast to the New York, New Jersey, and Illinois courts, the Ninth Circuit Court of Appeals held that "[t]here is no equitable reason to treat [an insured] as self-insured in face of [its insurer's] insolvency." *Cal. Ins. Co. v. Stimson Lumber Co.*, 325 Fed. App'x 496, 499 (9th Cir. 2009).  The Ninth Circuit found that it would be unreasonable to treat the insured as self-insured, when it sought to limit its liability by purchasing primary insurance.  *Id.*  Similarly, in *Nationwide Mutual Insurance Co. v. Lafarge Corp.*, a court apportioned defense costs among the remaining solvent insurers because "the fairest and most equitable result is for the solvent primary insurers to bear the risk associated with the insolvency of [the insolvent insurer]."  No. H-90-2390, 1994 WL 706538, *113 (D. Md. June 22, 1994).  However, the *Stimson* and *Lafarge* courts focused on the question of defense costs, and many courts, including courts in Minnesota, treat the allocation of indemnity costs differently than costs arising under the duty to defend.  *See, e.g.*, *Wooddale*, 722 N.W.2d at 301-02 ("It is axiomatic that the duty to defend is broader than the duty to indemnify."); *see also id.* at 303 n.16 ("[W]e reject[] the argument that an insurer is liable solely for defense costs allocable to the period of

time it was on the risk when we allocated all defense costs to the insurer, despite the fact that the insured was partially liable for indemnity costs due to uninsured periods during the liability allocation period." (discussing holding in *Domtar*, 563 N.W.2d at 741)).

The Eighth Circuit has also addressed insolvency in the context of excess policies, stating that:

> Ordinarily, excess insurers are not deemed to have provided drop down coverage in the event of an underlying insurer's insolvency. . . . Construing the [excess] policy to require indemnification would essentially make the policy a guaranty of the solvency of [the primary insurer]. Excess policies are intended to provide low cost coverage for catastrophic losses beyond the bounds of ordinary primary limits, and the insurer must be able to ascertain the point at which its liability will attach in order to evaluate the insurable risk and its cost of coverage.

*Interco Inc. v. Nat'l Sur. Corp.*, 900 F.2d 1264, 1267-68 (8th Cir. 1990). Thus both the Eighth Circuit and courts in other jurisdictions place the burden on an insured for uninsured periods due to insurer insolvency when allocating a continuous harm.

### C.    Allocation

While courts in other jurisdictions have squarely resolved how to treat an insured faced with claims for continuous harm whose insurance carrier is insolvent, the Minnesota Supreme Court has yet to address this precise situation. The parties argue essentially two points: whether "available" (or "unavailable") means generally available in the marketplace, or can be read more expansively to mean "unavailable for **any** reason, including insolvency," and if the drop down coverage method applied in multi-layer insurance coverage schemes can apply in some fashion here.

Fuller argues that the Court should read *Wooddale* broadly and find that coverage may be "unavailable" **both** when no coverage is available in the market, **and** when it was purchased from an insurer who later became insolvent. Fuller also argues that an insurer's insolvency does not satisfy the "voluntary" aspect of the court's rule, thus because they did not "voluntarily" self-insure, no loss should be allocated to them.

The holding in *Wooddale* leaves a gap into which the facts of this case neatly fit: here, insurance was clearly "available" in the marketplace because Fuller purchased it. It is equally clear that Fuller did not "voluntarily" self-insure. Instead, Fuller purchased available insurance from a company that later became insolvent, in some sense "involuntarily" becoming self-insured. Though the Minnesota Supreme Court has not specifically addressed whether an insurer's insolvency could make the resulting lack of insurance coverage involuntary or be considered unavailable, it has repeatedly found that insureds are responsible for uninsured periods. *See Jostens*, 403 N.W.2d at 630-31; *see also Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1396 (8th Cir. 1996) ("The Archdiocese must bear its share of the liability risk for the period in which it had no insurance coverage . . . ."); *Domtar*, 563 N.W.2d at 732 n.5 (citing cases). Further, the *Wooddale* court said that "voluntary" self-insurance was the test in that particular case to determine whether to allocate, but it did not **limit** the allocation inquiry to questions of voluntariness. Read as a whole, *Wooddale* and its predecessors focus on the question of availability **in the market**. *See also St. Paul Mercury Ins. Co.*, 2009 WL 2596074, at *8.

Additional support for this conclusion is found in decisions determining that an insured should be allocated liability when it purchased too little insurance. *See*

*Stonewall*, 73 F.3d at 1203 ("[P]roration is appropriate as to years in which [the insured] elected not to purchase insurance or purchased insufficient insurance, as demonstrated by the exhaustion of its policy limits."); *Benjamin Moore*, 843 A.2d at 1103 ("Policyholders who . . . underinsure must sustain the burden of those choices."). Underinsuring is akin to "involuntarily" self-insuring, in that the insured predicted how much insurance it would need but was incorrect: the insured voluntarily chose to insure, but did so inadequately.

Further, adopting Fuller's interpretation of *Wooddale* would require the Carriers to essentially "move over" to cover the insolvent insurers' liability, similar to how excess insurers can contract to provide coverage when a primary insurer is unable – sometimes referred to as "drop down coverage." In *Seaway Port Authority of Duluth v. Midland Insurance Co.*, 430 N.W.2d 242 (Minn. Ct. App. 1988), a policyholder sought contribution from two primary and one excess insurer for lawsuits arising from a bond default. The primary insurers became insolvent, and the policyholder argued that the excess insurer was required to cover the claims that the primary carriers would have been liable for were they not insolvent. *Id.* at 246. The court found that the excess insurer was not required to "drop down" because "[t]here is nothing in the plain language of [the policy] . . . which supports the trial court's finding that [the secondary insurer] is liable for **all** of the [policyholder's] losses." *Id.* at 248 (emphasis in original). The court also found "no compelling public policy reasons" for holding the secondary insurer liable for the losses, because "[n]othing in the language of the excess policy would reasonably lead [the insured] to expect that [the secondary insurer] would be liable for all of [its] losses

. . . ." *Id.* at 249.   Finally, "[i]n cases from other jurisdictions where an excess insurer was required to 'drop down' and cover losses that should have been paid by an insolvent primary insurer, the result was based on the language of the excess policy [i.e. a trigger], not general considerations of public policy." *Id.*   Similarly, in *Interco*, the Eighth Circuit declined to force an excess insurer to "drop down" to cover a primary insurer's insolvency.   900 F.2d at 1268 ("[T]he [excess insurance] coverage clause should not be read to create an obligation to pay losses within the policy limits of the insolvent underlying insurer.").

This case presents a situation with perhaps a stronger rationale than *Seaway* to allocate liability to Fuller.   Here, the Carriers did not provide **any** insurance coverage for the relevant period, unlike in *Seaway* and *Interco* where the relevant periods were covered but the triggers were not met.   No case suggests that an insurer should be required to "move over" to a policy period to act as a guarantor of another insurer who has become insolvent, when no policy language so provides.   Nor is Fuller's argument that the comparison with "drop down" policies confuses trigger with allocation availing: the insurers in *Seaway* and *Interco* did not agree to provide coverage below a triggering threshold, and Carriers in this case did not agree to provide coverage between 1980 and 1984.   The relevant comparison is whether an insurer agreed to cover a particular liability, be it after reaching a certain threshold, or for a certain period of time.

Fuller's public policy argument in favor of allocating liability exclusively to Carriers necessarily requires insurers that are no longer on-the-risk to be held responsible for the failure of other insurers to remain solvent.   This would effectively force insurers

to underwrite an insured's other insurance purchasing decisions, becoming a guarantor of all companies. The Court does not find this outcome supported by considerations of public policy. Based on the principles in *NSP* and *Wooddale*, and supported by precedent in other jurisdictions, the better understanding of Minnesota law requires finding that insurance was "available" to Fuller, and that liability should be allocated to Fuller for the insolvent insurers' policy periods. Thus, the Court grants Carriers' partial motion for summary judgment on the issue of allocation of insurance liability, and denies Fuller's motion.[3]

## III.   CERTIFICATION TO THE MINNESOTA SUPREME COURT

The Minnesota Supreme Court "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute . . . ." Minn. Stat. § 480.065, subd. 3 (2008). Use of a state's certification procedure by a federal district court rests in the court's sound discretion. *Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974); *Allstate Ins. Co. v.*

---

[3] Carriers argue that even if the allocation issue presently before the Court cannot be resolved as a matter of law, the Court should not grant summary judgment to Fuller because they have not yet received responses to discovery served on Fuller. Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to . . . take discovery . . . ." Whether the information Carriers seek is in the record is immaterial to resolution of the present motions which can be resolved as questions of law. Insurance was available to Fuller, and the Court determines that the burden of the insolvent insurer's inability to pay falls on Fuller, not on the other insurers. Thus the issues relating to Rule 56(d) are moot.

*Steele*, 74 F.3d 878, 881 (8th Cir. 1996).  Though certification may "in the long run save time, energy, and resources and help[] build a cooperative judicial federalism,[]" it is not obligatory even when state law is in doubt.  *Lehman*, 416 U.S. at 391.  A federal court's "most important consideration" in deciding whether to certify a question to a state court is whether it "finds itself genuinely uncertain about a question of state law."  *Johnson v. John Deere Co.*, 935 F.2d 151, 153 (8th Cir. 1991) (quoting *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C. Cir. 1988)).  Absent a "'close' question of state law or the lack of state sources, a federal court should determine all the issues before it."  *Id.* at 154 (citing *Perkins v. Clark Equip. Co.*, 823 F.2d 207, 209 (8th Cir. 1987)).

Fuller suggests that to the extent the Court finds Minnesota law unclear as to allocation in this case, the Court should certify the following question to the Minnesota Supreme Court:

> Whether application of Minnesota's "time on the risk" insurance allocation method includes uninsured policy years only where the insured was voluntarily self-insured and, hence, excludes policy years where the insured purchased insurance from carriers that have now become insolvent.

(Pl.'s Mot. for Summ. J. at 21, Docket No. 72.)

Though the Supreme Court has not spoken on the issue in this case directly, as described above, the Supreme Court has enumerated various principles which, in conjunction with precedent in other jurisdictions and considerations of public policy, allow the Court to determine the issue before it without obtaining an opinion from another court.  Thus the Court will not certify Fuller's proposed question to the Minnesota Supreme Court.

## ORDER

Based on the foregoing and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiff's Motion for Partial Summary Judgment or Alternatively to Certify a Question of Law [Docket No. 72] is **DENIED**.

2.    United States Fire Insurance Company, Allstate Insurance Company, and International Insurance Company's Cross Motion for Partial Summary Judgment [Docket No. 86] is **GRANTED.**

3.    First State Insurance Company's Joinder to Certain Insurers' (I) Opposition to H.B. Fuller's Motion for Partial Summary Judgment or Alternatively to Certify a Question of Law and (II) Memorandum in Support of Cross-Motion for Partial Summary Judgment [Docket No. 90] is **GRANTED.**


DATED:  July 18, 2011                                    s/ John R. Tunheim
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                         United States District Judge